## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DOMINIC MEDEIROS, | : | Case No. 3:21-CV-1056 (OAW) |
| SHEILA MARCIL, | : | |
| *Plaintiffs,* | : | |
| v. | : | |
| | : | |
| POINT PICKUP TECHNOLOGIES, INC. | : | |
| *Defendants.* | : | APRIL 20, 2023 |

### <u>RULING ON DEFENDANT'S MOTION TO COMPEL ARBITRATION</u>

Plaintiffs Dominic Medeiros and Sheila Marcil ("Plaintiffs") are former retail and grocery store delivery drivers for Defendant Point Pickup Technologies, Inc. ("Defendant" or "Point Pickup").  They bring this action on behalf of a putative class against Defendant, which owns and operates the mobile phone application through which drivers accept orders to deliver groceries and merchandise to residential and business customers. Plaintiffs allege unpaid wages and unpaid overtime pursuant to the Fair Labor Standards Act ("FLSA") and Massachusetts wage and hour laws, as well as claims of unjust enrichment and unfair trade practices.  Defendant moves to compel arbitration and to stay this action.  Mot. to Compel, ECF No. 37.  Plaintiffs argue there is no agreement to arbitrate their claims and, even if such agreement exists, they are exempt from arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*

For the reasons stated herein, the court finds that the parties have agreed to arbitrate the claims brought in the complaint.  Moreover, because Plaintiffs are not workers engaged in interstate commerce, they are not exempt from arbitrating under the FAA.  Accordingly, the motion to compel hereby is **<u>GRANTED</u>.**  Plaintiffs must arbitrate their claims individually, and the case shall be stayed pending arbitration.

I.    **BACKGROUND**

Defendant is a Connecticut-based delivery company that delivers products from retail and grocery stores such as Wal-Mart, GameStop, and Shaw's Supermarket. Compl. at ¶ 1, ECF No. 1.   To complete deliveries, Defendant engages local drivers known as "Pickup Partners."   Peterson Decl. at ¶ 2, ECF No. 38.   To become a Pickup Partner, a driver must first download onto their mobile device the Point Pickup application (the "App") and activate an account.   *See id.* at ¶ 2. After creating the account, a series of deliveries is presented on the App.   *Id.* at ¶ 3.   Each available delivery is listed with a statement of miles that must be driven, and the amount of compensation that Defendant will pay for the job.   *Id.* at ¶ 13.   If a driver accepts an available delivery job, the driver must visit the local retailer (often a grocery store), load the order into their vehicle, and deliver it to the customer.   *Id.* at ¶¶ 16–18.

Plaintiffs allege that drivers typically rely on the quoted number of miles when selecting a delivery job, but Defendant's quoted mileage often is incorrect.   *Id.* at ¶ 15. Plaintiffs claim that they "often cross state lines in their work for Defendant as they regularly pick-up products in Massachusetts and deliver them in Rhode Island."   *Id.* at ¶ 31.   Moreover, Plaintiffs allege that "delivery drivers often wait one or two hours until the products are ready to be picked up for delivery [and] receive no additional compensation for this time."   *Id.* at ¶ 17.   Lastly, Plaintiffs allege that "[w]hen there is a large volume of deliveries, a dispatch employee of Point Pickup will call drivers and tell them that they are needed to sign-in and take job assignments."   *Id.* at ¶ 21.

Defendant classifies its Pickup Partners as independent contractors, but Plaintiffs allege that the "drivers are actually [Defendant's] employees."  *Id.* at ¶ 11.  As a result, Plaintiffs claim that they are entitled to minimum wage, overtime compensation, and other benefits and protections afforded to employees under federal and state wage and hour laws.  *Id.* at    ¶¶ 34–36, 39–41.  Plaintiffs also assert two state law claims of unjust enrichment and unfair and deceptive trade practices.  *Id.* at ¶¶ 37–38.

In response to the complaint, Defendant has filed a motion to compel arbitration. Mot. to Compel, ECF No. 36.  Defendant argues that Plaintiffs have signed an arbitration agreement requiring them to individually arbitrate the claims asserted in the complaint. In support, Defendant cites three agreements, each of which purportedly binds Plaintiffs to arbitration: (1) the Mutual Dispute Resolution Agreement ("MDRA"); (2) the End User License Agreement & Terms of Service ("EULA"), which is incorporated in Defendant's Delivery Provider Agreement ("DPA"); (3) and the Non-Disclosure and Dispute Resolution Agreement ("NDDRA").  While Defendant cites three different agreements, it seeks to compel arbitration based only on the MDRA.  Def.'s Mem. of Law at 2, ECF No. 37.

### A. The Arbitration Agreements

To become a Pickup Partner, a driver must first sign up through Defendant's App and agree to the various terms & conditions.  *Id.* at 2.  Defendant describes the process as follows:

After downloading the App, the driver is asked to create an account and to enter basic information, including their contact details and password setup.  *Id.* at 3.  After verifying the account, the driver is presented with a complete copy of the DPA, which includes the terms of Defendant's EULA.  *Id.*  The driver cannot accept the DPA until the

user has scrolled through the entire agreement and has selected "Accept Delivery Provider Agreement" at the bottom of the display screen. *Id.* at 4.

### *DPA & EULA*

The DPA provides as follows:

> Delivery Provider hereby agrees: (a) to engage Point Pickup to provide the Point Pickup Services; (b) to comply with this Agreement; and (c) that Delivery Provider has read, understands, and agreed to (i) the Point Pickup End User License Agreement and Terms of Service located at www.pointpickup.com/eula ("**EULA**"), (ii) the Point Pickup Privacy Policy located at www.pointpickup.com/privacy-policy ("**Privacy Policy**"), and (iii) the Background Check Disclosure and Authorization located at www.pointpickup.com/background-check-disclosure.

DPA at p. 1, ECF No. 38-1 (emphasis in original).   The EULA is available on Defendant's website.   The EULA "is a binding contract between [the driver] and [Defendant] governing [the] use of the Point Pickup mobile application (the "App") and any website or online property under [Defendant]'s control that references [the] EULA (the "Website" and collectively with the App, the "Service")."   EULA at p.1, ECF No. 38-2.  The EULA contains a provision for dispute resolution:

> 19. <u>Dispute Resolution</u>
>
> a.   <u>Mandatory Arbitration</u>. Please read this carefully.
>
> It affects your rights. YOU AND POINT PICKUP AND EACH OF OUR RESPECTIVE CORPORATE PARENTS, SUBSIDIARIES, AFFILIATES, PREDECESSORS IN INTEREST, SUCCESSORS, AND PERMITTED ASSIGNS AGREE TO ARBITRATION (EXCEPT FOR MATTERS THAT MAY BE TAKEN TO SMALL CLAIMS COURT), AS THE EXCLUSIVE FORM OF DISPUTE RESOLUTION EXCEPT AS PROVIDED FOR BELOW, FOR ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THESE TERMS OR YOUR USE OF THE SERVICE. Arbitration uses a neutral arbitrator instead of a judge or jury, allows for more

limited discovery than in court, and is subject to very limited review by courts. Please visit www.adr.org for more information about arbitration.

*Id.* at p. 17.

### *MDRA*

After accepting the DPA in the App, the driver is then presented with a copy of the MDRA.   The MDRA specifies that "[w]here resolution cannot be achieved through dialogue and informal problem solving, the [driver] . . . and [Defendant] agree, by signing this [MDRA], to use the arbitration procedures in this Agreement instead of a trial in court before a judge or jury to resolve the dispute."   MDRA at § 1, ECF No. 38-3 ("MDRA"). The MDRA[1] further specifies that "disputes concerning allegations of misclassification or statutory wage and hour violations" shall be resolved through binding arbitration:

### 2.   Covered Claims

a.  Other than as provided in this Agreement, to the maximum extent permitted by applicable law, Contractor and PPUP agree that any controversy, dispute, or claim relating to or arising out of Contractor's provision of contracted services to PPUP (including but not limited to disputes with current and former officers, directors, employees, members, customers, clients, vendors, parents, subsidiaries, affiliated companies, successors, assigns, and agents of either party, and disputes concerning allegations of misclassification or statutory wage and hour violations) shall be resolved through binding arbitration rather than in court. It is the parties' intent to resolve all disputes through binding arbitration and not in court.

b.  …

c.  Covered claims include, but are not limited to, claims for breach of contract; unpaid money, employment misclassification; misappropriation of trade secrets; unfair competition; violation of public policy; wrongful termination; tort claims; claims for unlawful harassment,

---

[1] Defendant Point Pickup Technologies, Inc. often abbreviates itself "PPUP" (as it does in its brief).

discrimination, and/or retaliation (e.g., the New Jersey Law Against Discrimination, New Jersey Conscientious Employee Protection Act); common law claims; and claims for violation of any federal, state, local, or other government law, statute, regulation, or ordinance, such as, for example, claims under the Age Discrimination in Employment Act, the Americans with Disabilities Act; Title VII of the Civil Rights Act of 1964; the Equal Pay Act; the Fair Credit Reporting Act; the Fair Labor Standards Act; the Family and Medical Leave Act.

*Id.* at § 2(a), (c).  The agreement also specifies that any arbitration must proceed individually:

**5. Waiver of Class, Collective, Multi-Plaintiff, and Representative Actions ("Waiver")**: Covered claims must be brought on an individual basis only, and arbitration on an individual basis is the exclusive remedy. No arbitrator has authority to consolidate claims or proceed with arbitration on multi-plaintiff, class, collective, or representative basis. Should such a claim be initiated in arbitration, the arbitrator shall summarily reject it as beyond the scope of this Agreement. Any disputes concerning the applicability or validity of this Waiver shall be decided by a court of competent jurisdiction, not by the arbitrator. In the event a court of competent jurisdiction determines that this Waiver is unenforceable with respect to any claim, this Waiver shall not apply to that claim, and that claim only must be initiated in court (subject to applicable claims and defenses) as the exclusive forum.

*Id.* at § 5.  Moreover, disputes about the arbitrability of any claim must be submitted to an arbitrator.  *Id.* at § 6 ("[T]he arbitrator shall have the exclusive authority to resolve any dispute relating to the arbitrability of any individual claim or the enforceability or formation of this Agreement[.]").

### *NDDRA*

6

After scrolling through and agreeing to the MDRA on the App, the user is then presented with the NDDRA.  The NDDRA is an agreement between Wal-Mart and drivers who use Defendant's platform to deliver Wal-Mart customer orders.  NDDRA, ECF No. 38-4.  The NDDRA includes the following arbitration provisions:

> **B.     ARBITRATION OF CLAIMS**: In the event of any dispute between the Parties not resolved in accordance with Section 12, A., above, the Parties agree to resolve any covered dispute as described in this Section 12, B (the "Arbitration Provision"). . . . Unless expressly limited below, this Arbitration Provision applies to any and all disputes brought by either Contractor or Walmart against the other Party, including disputes arising out of or related to these Terms of Use, . . . Contractor's classification as an independent contractor,  . . . . **Except as it otherwise provides, this Arbitration Provision is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or any other forum other than arbitration, and requires all such disputes to be resolved on an individual basis and only by an arbitrator through final and binding arbitration and not by way of a court or jury trial, nor a proceeding before any other governmental body, and not by way of a class, collective or representative action or proceeding**.
>
> i.     _Claims Covered By Arbitration Provision_: Unless excluded below (including without limitation in Section II, C., below), claims involving the following disputes shall be subject to arbitration under this Arbitration Provision regardless of whether brought by Walmart against Contractor or by Contractor against Walmart . . . . This Arbitration Provision also applies, without limitation, to disputes regarding any . . . state or federal wage-hour law . . . unfair competition, compensation, meal or rest periods, expense reimbursement, uniform maintenance, training, . . . Fair Labor Standards Act, . . . , and all other federal, state or local statutory and legal claims (including without limitation torts).

_Id_. at § II(B)(i).  Defendant is a third-party beneficiary of the NDDRA.  _Id_. at § II(B)(ii) ("The Parties also agree that any entity with whom Contractor contracted to perform

delivery services to Walmart customers . . . are intended third party beneficiaries of this Arbitration Provision[.]").

A driver may become a Pickup Partner with Defendant only by agreeing to the DPA (which incorporates the EULA), the MDRA, and the NDDRA through the App.  After the account is activated, the driver is alerted when local deliveries are available.


## II.    STANDARD

The FAA requires federal courts to enforce arbitration agreements.  *See* 9 U.S.C. §§ 1 *et seq.* ("A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid[.]").  The FAA reflects "Congress' recognition that arbitration is to be encouraged as a means of reducing the costs and delays associated with litigation." *Vera v. Saks & Co.,* 335 F.3d 109, 116 (2d Cir. 2003).  Under the FAA, a court may stay a federal lawsuit in order to enforce an arbitration agreement, 9 U.S.C. § 3, and to compel arbitration.  *Id.* at § 4.

In deciding whether a dispute is arbitrable, "the court must engage in a two-step process: first, it must determine whether the parties agreed to arbitrate, and second, it must determine whether the scope of the agreement encompasses the claims asserted." *Campaniello Imports, Ltd. V. Saporiti Italia S.p.A.*, 117 F.3d 655, 666 (2d Cir. 1997).  Also, the court must evaluate whether the agreement is enforceable under the FAA.  Section 1 of the FAA excludes from its coverage "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."  9 U.S.C. § 1.  "[A] court should decide for itself whether § 1's 'contracts of employment'"

exclusion applies before ordering arbitration." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 537 (2019).

The party seeking to stay the case in favor of arbitration bears an initial burden of demonstrating the existence of an agreement to arbitrate. *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010).  The moving party is not required to show that the agreement is *enforceable* but, rather, that an agreement merely exists.  *Id.*  "[I]n deciding whether the parties agreed to arbitrate a certain matter, courts should generally apply state-law principles that govern the formation of contracts."  *Mehler v. Terminix Int'l Co. L.P.,* 205 F.3d 44, 48 (2d Cir. 2000), *cert. denied,* 533 U.S. 911 (2001).

After the movant demonstrates the existence of an arbitration agreement, "the burden shifts to the party opposing arbitration to put the making of that agreement 'in issue.'"  *Hines*, 380 F. App'x at 24.  The party in opposition also may show that the agreement is inapplicable to the claims at issue, or that it otherwise is invalid.  *Ventoso v. Shihara*, No. 19 CIV. 3589 (PAE), 2019 WL 9045083, at *3 (S.D.N.Y. June 26, 2019). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25 (1983).

"A court adjudicating a motion to compel arbitration applies 'a standard similar to that applicable for a motion for summary judgment,' considering whether there is any 'triable issue of fact' as to the making of an agreement to arbitrate or failure to comply."  *Gaul v. Chrysler Fin. Servs. Americas LLC*, 657 F. App'x 16, 17 (2d Cir. 2016) (citation omitted); *see also* 9 U.S.C. § 4 ("[U]pon being satisfied that the making of the

agreement for arbitration or the failure to comply is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.").

### III.   DISCUSSION

#### A.  <u>Whether a Valid Arbitration Agreement Exists</u>

Defendant argues that the MDRA, in addition to the EULA and the NDDRA, reflects a valid agreement to arbitrate the claims brought by Plaintiffs.  Plaintiffs contend that no such agreement exists because the dispute resolution terms within the MDRA, EULA, and the NDDRA, are inconsistent.  Given the varying nature of the agreements, Plaintiffs argue that there was no meeting of the minds as to the essential terms of an agreement to arbitrate.

"Because an agreement to arbitrate is a creature of contract . . . the ultimate question of whether the parties agreed to arbitrate is determined by state law."  *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002).  Under Connecticut law, a contract is valid only if there is a meeting of the minds.  *Helenese v. Oracle Corp.*, No. 09-351, 2010 WL 670172, at *3 (D. Conn. Feb. 19, 2010) (citing *Gibbs v. Conn. Gen. Life Ins.*, 97-0567009, 1998 WL 123010, at *2 (Conn. Super. Ct. March 3, 1998)).  On the other hand, where parties "fail to agree to essential contract terms, the agreement does not come into existence—it is void and wholly unenforceable."  *Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co.*, 263 F.3d 26, 31 (2d Cir. 2001) (noting general principles of contract law).  Connecticut courts have not yet addressed whether conflicting arbitration provisions impede the formation of an agreement to arbitrate.

In becoming delivery drivers for Defendant, Plaintiffs executed three distinct agreements each containing an arbitration provision: the MDRA, NDDRA, and the EULA.[2] The MDRA is Defendant's dispute resolution agreement. It contemplates that "any controversy, dispute, or claim relating to or arising out of [a driver's] provision of contracted services to [Defendant] . . . shall be resolved through binding arbitration rather than in court." MDRA § 2(a), ECF No. 38-3. Claims subject to arbitration under the MDRA include disputes over "misclassification," "unfair competition," and "claims for violation of any federal, [or] state . . . statute." *Id.* at § 2(c). The MDRA undoubtedly covers the claims at issue. The complaint alleges theories of misclassification, including wage and hour violations, unjust enrichment, and deceptive trade practices. Moreover, the claims arise from the "provision of contracted services" because the delivery service performed by Plaintiffs is the crux of their complaint.

Plaintiffs contend that no agreement to arbitrate exists because the terms of the MDRA are inconsistent with the dispute resolution terms found in the EULA and the NDDRA. However, the court finds no such inconsistency. Each of the three agreements contains an arbitration provision applicable to a distinct set of disputes not covered under the terms of the other agreements. For example, the EULA governs a driver's "use of the Point Pickup mobile application . . . and any website or online property under Point Pickup's control." EULA at p. 1, ECF No. 38-2. The agreement defines the app and website as the "Service." *Id.* The EULA's mandatory arbitration provision is limited to "ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO **THESE TERMS** OR YOUR USE OF **THE SERVICE**." *Id.* at § 19(a) (emphasis added). The MDRA, on

---

[2] Plaintiffs do not contest that they executed these agreements upon becoming delivery drivers for Defendant. *See* Pl.'s Opp. at 6–10.

the other hand, is applicable only to disputes "arising out of [a driver's] provision of contracted services to [Defendant.]"  MDRA § 2(a).  Thus, although the two agreements each contain an arbitration provision with varying terms, the EULA's limitation on the scope of arbitrable claims prevents any inconsistencies that may arise between the EULA and the MDRA.  If a driver had a dispute related to Defendant's online platforms, the driver must proceed under the arbitration provision of the EULA.  Disputes arising from the "provision of contracted services," such as those alleged in the complaint, are governed by the MDRA.  The EULA is not applicable to disputes covered under the MDRA, nor is the MDRA applicable to disputes covered under the EULA.  Defendant's decision to treat different types of disputes with different arbitration terms (such as the governing law, payment of fees, and arbitration procedure), does not render the arbitration provisions inconsistent with one another.

The same can be said with respect to the NDDRA.  In a section entitled "Claims Covered by Arbitration Provision," the NDDRA expressly states that the following disputes are subject to arbitration: "(1) disputes arising out of or related to these Terms of Use; (2) disputes arising out of or related to the actual or any alleged relationship between [a driver] and Walmart . . . (3) disputes arising out of or relating to [a driver's] performance of delivery services to Walmart customers; (4) disputes arising out of or relating to the interpretation or application of this Arbitration Provision."  NDDRA § II(B)(i), ECF No. 38-4.  Other disputes pertaining to federal and state law also are covered under the arbitration provision, provided that such disputes relate to "[a driver's] relationship with Walmart or the termination of that relationship."  *Id.*  Defendant is a third-party beneficiary of Walmart's arbitration provision in the NDDRA.  *Id.* at NDDRA § II(B)(ii).  However, as

a third-party beneficiary, Defendant's rights are no greater than that of Walmart's. *H & L Chevrolet, Inc. v. Berkley Ins. Co.*, 110 Conn. App. 428, 435 n.3 (2008) (noting that a third-party beneficiary is subject to limitations of contract terms as the beneficiary has no greater rights than are provided in contract itself).   Thus, Defendant's ability to compel arbitration under the NDDRA is limited to disputes that relate to a driver's "relationship with Walmart or the termination of that relationship."   NDDRA § II(B)(i).   Plaintiffs' claims do not pertain to Walmart.   Plaintiffs' misclassification allegations revolve around their relationship with Defendant—not Walmart.   Thus, Plaintiffs cannot use the NDDRA as a basis for inconsistent terms with the MDRA.   Like the EULA, the NDDRA seeks to arbitrate disputes unrelated to the one here at issue.   Accordingly, the court finds that the agreements are not inconsistent.

The cases cited by Plaintiffs appear to have been governed by multiple, conflicting agreements, and thus are distinguishable from the case at bar.   *See Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 366 (2d Cir. 2003) (holding that infringement action arising from a failed joint venture was not subject to arbitration because each of the parties had drafted different versions of an arbitration provision to be incorporated into the final non-circumvention agreement); *Ragab v. Howard*, 841 F.3d 1134, 1138 (10th Cir. 2016) (explaining that claims falling within the scope of six different arbitration agreements were not subject to arbitration because there was "no language in the six agreements that suggests one contract overrides the others"); *NAACP of Camden Cnty. E. v. Foulke Mgmt. Corp.*, 24 A.3d 777, 782–84 (N.H. App. Div. 2011) (finding that plaintiff's claims against a car dealership were not arbitrable where conflicting arbitration provisions were "scattered" among three agreements, each of which purportedly applied to "all claims"

arising out of plaintiff's vehicle purchase).  Unlike the cited cases, Plaintiff's claims in the present matter are governed by only one agreement: the MDRA.  The arbitration provisions in the EULA and the NDDRA apply to disputes that are not covered under the MDRA.  Contrary to Plaintiffs' contention, Defendants cannot "pick-and-choose" which agreement to invoke based on the terms most favorable to the dispute at hand.  Pl.'s Opp. at 10, ECF No. 42.  Instead, Defendant is bound by each agreement's limitation on the scope of arbitrable claims.  The court finds that the MDRA is an enforceable agreement to arbitrate the claims brought by Plaintiffs.[3]

### B.  Whether the FAA Exempts Plaintiffs from Arbitration

Plaintiffs argue that even if there is an agreement to arbitrate, they cannot be compelled to arbitrate because the FAA exempts them from its coverage.  Defendants argue that the FAA exemption is inapplicable to Plaintiffs.

The FAA provides that "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The FAA reflects a "liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).  Nonetheless, Section 1 expressly excludes from the Act's coverage "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate

---

[3] Because each of the agreements at issue applies to a different type of dispute, the court does not reach the issue of whether state law would prevent the formation of an arbitration agreement where the scope of claims to be arbitrated in one agreement overlaps with a different, conflicting agreement.

commerce."  9 U.S.C. § 1.  Although the statute references "contracts of employment," the exclusion applies to contracts involving independent contractors, in addition to employee-employer contracts. *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 543 (2019). Plaintiffs are characterized by Defendant as independent contractors, which they argue misclassifies their employee-employer relationship.  Because the FAA equally applies to both types of contracts, the issue is whether Plaintiffs fall within the "residual category" of exclusions pertaining to "any other class of workers engaged in foreign or interstate commerce."  9 U.S.C. § 1.

In determining whether Plaintiffs were engaged in foreign or interstate conduct, additional context is helpful; particularly, a review of Point Pickup and its normal activity.

### ***Point Pickup's Purpose***

Point Pickup explains in its limitations section of the EULA that it is "NOT A TRANSPORTATION CARRIER OR A MOVING OR HAULING OF FREIGHT CARRIER." EULA § 1(b), ECF No. 38-2 (emphasis in original).  Instead, it "matches Delivery Providers [such as plaintiffs] with Customers wishing . . . to relocate physical items . . . from a specified pickup point . . . to a specified delivery point . . . ."  EULA § 1(a) at 1.  So, generally, when a customer of a (presumably, local) retail store or supermarket wants their selected goods delivered, Point Pickup looks for a nearby driver to deliver them. Point Pickup's business model allows a store's customer to interact directly with their local store and to place an order with that store for the home delivery of local items, Point Pickup Website, ECF No. 42-1 at 3, and then (behind the scenes) Point Pickup summons one of its drivers "within the applicable zone of service", DPA § 4(a), ECF No. 38-1, to seamlessly provide same-day delivery, Point Pickup LinkedIn, ECF No. 42-1 at 8, in a

manner that allows for personal, responsive interaction that Defendant likens to "the days of the 'milkman'", Point Pickup Website, ECF No. 42-1 at 5.  Again, it seems clear that Point Pickup aims to connect customers directly to the customers' local stores for ordering and same-day delivery of items with a responsive and personal touch, and in a manner that does not seem to contemplate interstate reach.

Point Pickup's drivers (called "Delivery Providers", EULA at 1, or, as noted above, "Pickup Partners") are not required to possess a commercial driver's license (CDL), and they use their own vehicles, for which they cover their own expenses (including tolls, insurance, and fuel).  DPA §§ 3, 4(b), ECF No. 38-1; *see also* Medeiros Decl. at ¶ 16, ECF No. 42-2.  And nothing in Point Pickup's written agreements or business model suggests that interstate delivery normally is expected of its drivers.  The aim to provide same-state, local delivery seems evident in the context of the DPA, which contemplates that Delivery Providers might opt to use a *bicycle* to perform their normal services.  DPA § 5 ("You further represent . . . that: . . . (c) you own, or have the legal right to operate, . . . [any] *bicycle(s)* you intend to use or do actually use for Jobs . . .") (emphasis added).  In fact, the DPA makes clear that Delivery Providers such as Plaintiffs have the option *not* to use a vehicle *at all* when carrying out their jobs.  DPA § 3 ("If you *elect to* use a Vehicle (as defined below) to perform Jobs, . . .") (emphasis added).  The EULA even mentions that "Point Pickup will make *commercially reasonable* efforts to connect [the customer] with a Delivery Provider to perform the Job", EULA § 4(a) (emphasis added), and it notes that Defendant's drivers have the discretion to ensure that delivery is economically practical.  *Id.* at p. 5–6.

Taken together, the contents of the record clearly establish that Defendant Point Pickup aims to provide customers with local drivers who can deliver goods purchased from local stores.  As stated in the Peterson Declaration (in describing the process of a driver accepting a job), "If a Pickup Partner selects to take delivery, the Pickup Partner visits the *local retailer (often a grocer)* where the Pickup Partner collects the packaged customer order from the retailer *(typically a bag or bags of groceries)* and then takes the order to the *local customer* who is *usually no more than a few miles away from the store*."  Peterson Decl. ¶ 16, ECF No. 38 (emphasis added).  Providing an undeniably large sample size, the Point Pickup Chief Analytics Officer Dauvin Peterson attests, "Since 2018, Pickup Partners have completed approximately 15.3 million local deliveries.  Only two percent of those deliveries originated in one state and were delivered to a customer in another.  In each of those instances, the retailer and customer resided close to a state's border."  Peterson Decl. ¶ 20.

As such, it is misleading for Plaintiffs to suggest that Defendant is "incorrect", Pl.'s Opp. at 12, ECF No. 42, in highlighting the localized, in-state nature of the deliveries it generally facilitates, even if Point Pickup itself is a national company.  And while some of the retailers (that Point Pickup connects with customers) might themselves have a national or even an international presence, Point Pickup connects customers with retailers and with grocers that are close to them.  It would be unreasonable to review the record and to believe that Massachusetts customers would seek to directly order their groceries from a Texas store for same-day delivery, and it would be equally unreasonable to find that Point Pickup would aim to facilitate such distant connections through a network

of Delivery Providers who depend upon their own motor vehicles (or bicycles, or *no vehicles at all*) in transporting those ordered goods.[4]

For these reasons, it seems clear that Plaintiffs do not belong to a "class of workers engaged in foreign or interstate commerce" as exempted from the FAA.  Still, as noted by the Supreme Court of the United States, "§ 1 exempts classes of workers based on their conduct, not their employer's," *Southwest Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1788 (2022) (citation omitted) (internal quotations omitted) (emphasis in original), thus the court must begin by determining: 1) Plaintiffs' class of workers (by examining *their* actual work for Point Pickup, and not *Point Pickup's* work, generally), and 2) whether that class of workers is "engaged in foreign or interstate commerce" under § 1.  *See Saxon*, 142 S. Ct. at 1788–90.

### *The "Class of Workers" Defined by Plaintiffs' Work*

In determining Plaintiffs' class of workers, the court must look to their "*performance of work*" for Point Pickup.  *See Saxon*, 142 S. Ct. at 1788.

As already noted at length, in detail, and with pertinent context, Plaintiffs primarily performed in-state, same-day deliveries between retailers (such as grocers) and their local customers.  They did so for a company that did not require them to have a CDL, or even access to a vehicle.  So, even though Plaintiffs and other delivery providers delivered goods, they could do so "without a truck".  *See Bissonnette v. LePage Bakeries Park St., LLC*, 49 F.4th 655, 662 (2d Cir. 2022) (citations omitted).

---

[4] Indeed, in attempting to argue that Massachusetts law applies in this case, Plaintiffs concede that most of their work took place within the borders of their state (Massachusetts).  *See* Pl.'s Opp. at 18, ECF No. 42.  *See also* Medeiros Decl. at ¶ 14, ECF No. 42-2 ("However, the majority of my delivery services . . . and performing most of my deliveries occurred in Massachusetts."); Marcil Decl. at ¶ 8, ECF No. 42-3 ("Most of my deliveries originated from the Wal-Mart locations in Taunton and North Attleboro, Massachusetts.  Most of my services were performed in Massachusetts.").

Thus, Plaintiffs belong to a class of workers responsible for localized, quick delivery of goods.[5]

### ***Whether the Workers "Engaged in Foreign or Interstate Commerce"***

Next, the court must determine whether Plaintiffs' class of same-day delivery providers is "engaged in foreign or interstate commerce" as contemplated by § 1.  *See Saxon*, 142 S. Ct. at 1789.  Generally speaking, "any class of workers directly involved in transporting goods across state or international borders falls within § 1's exemption."  *Id.*  But *Saxon* involved workers who actively engaged in regular interstate commerce; the same cannot be said of Point Pickup's delivery providers.

In determining whether *Plaintiffs'* class of workers is exempted from the FAA under § 1, the Seventh Circuit would suggest examining "whether the interstate movement of goods is a central part of the class members' job description."  *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 801 (7th Cir. 2020).  It finds support from the Supreme Court of the United States, which directs us to examine the employment agreement in assessing whether a plaintiff's class of workers is engaged in interstate commerce.  *See New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019)).

---

[5] These deliveries predominantly occur within state borders, though occasionally (and, apparently, incidentally) they cross state lines in situations where stores and their customers are nearby but across state borders.  On the record before it, the court cannot reasonably define Plaintiffs' class of workers more narrowly (as, perhaps, Point Pickup drivers who happen to live or work near border towns), or more broadly; indeed, Plaintiffs themselves never attempt to define the putative class they aim to represent, beyond referring to it as a group of "similarly situated Point Pickup delivery drivers."  Pl.'s Opp. at 1, ECF No. 42; s*ee also id.* at 19–20.  Individually, they refer to each of themselves as "a delivery driver" (for a period of months in 2021), *id.* at 3, and they sometimes group themselves with "[a]ll delivery drivers", *id.* at 4, or with unspecified "other delivery drivers", *id.* at 3–4.  And when Plaintiffs wish to broaden the review of their work by mentioning Defendant's nationwide presence in all fifty states, the percentage of interstate deliveries becomes almost infinitesimal.  Accordingly, the court finds Plaintiffs to belong to a class of delivery providers tasked with same-day, local deliveries.

Nothing in any of the parties' agreements suggest that interstate transportation is an integral (or contemplated) element of a driver's employment.  Further, "The FAA embodies a *national* policy favoring arbitration, and it would be illogical if . . . drivers performing the same work for the same company in different cities were to have completely different rights and obligations under the FAA merely because of happenstance of geography."  *Davarci v. Uber Technologies, Inc.*, 2021 WL 3721374 (S.D.N.Y. Aug. 20, 2021) at *8 (internal quotations omitted) (citations omitted).  This is true of delivery providers who, no matter how short the walk, might transport groceries across a street that happens to divide two states.  *Wallace* also cites to a case in which the Eleventh Circuit expressed doubt that the § 1 FAA exemption would apply to "a pizza delivery person who delivered pizza across a state line to a customer in a neighboring town."  *Hill v. Rent-A-Center, Inc.*, 398 F.3d 1286, 1290 (11th Cir. 2005).  The *Hill* court explained that this is so because "the interstate transportation factor is a necessary but not sufficient showing for the purposes of the [§ 1] exemption."  *Id.*

In the present case, Plaintiffs occasionally might have engaged in the interstate transportation of groceries and other goods (no matter how short the interstate trips), but the employment agreements, job descriptions, and basic duties of the delivery providers in Plaintiffs' class make clear that such workers were not regularly engaged in interstate or foreign commerce, especially when not required to have access to a vehicle, and when most of their deliveries did not require them to leave the state.

Such short, local, same-day deliveries that regularly might have included perishable groceries coming from supermarkets within a customer's neighborhood cannot be found to comport with the "seamen" and "railroad employees" engaged in the interstate

and international commerce contemplated by § 1 so as to require exemption from the FAA.

The Rocky Hill – Glastonbury Ferry transports vehicles and pedestrians the short distance across the Connecticut River between those two Central Connecticut towns. *See* Rocky Hill – Glastonbury Ferry, Connecticut Department of Transportation website, available at: https://portal.ct.gov/DOT/Traveler/ferries/Rocky-Hill-Ferry (last visited Apr. 20, 2023).[6]  However, no reasonable person would find even the ferry boat's captain to be one of the "seamen" contemplated by § 1.  Arguably, this would be true, even if the river happened to divide two states.

While this court need not and does not adjudicate whether the ferry boat captain engages in interstate commerce (in her real, or her hypothetical, border-crossing state), "closer cases" than the one at bar might be decided through the guidance provided by the Eighth Circuit in *Lenz v. Yellow Transportation, Inc.*, 431 F.3d 348 (8th Cir. 2005), and as employed by the United States District Court for the District of Connecticut (*Hon. Kari A. Dooley, J.*) in *Bissonnette v. LePage Bakeries Park St., LLC,* 460 F. Supp. 3d 191, 196 (D. Conn. 2020), *aff'd on rehearing*, 49 F.4th 655 (2d Cir. 2022).  Reviewing those non-exclusive factors from *Lenz*, *see Bissonnette*, 49 F.4th at 662, further supports this court's finding that workers of Plaintiffs' class were not engaged in foreign or interstate commerce.  Workers like Plaintiffs transport goods, but they primarily do not deliver them across interstate lines, even if the goods themselves might have originated in another state.   The delivery providers simply take the goods from a local store to a nearby

---

[6] Google Maps location, available at:
https://www.google.com/maps/search/rocky+hill+ferry/@41.6645397,-72.6327479,15.96z (last visited Apr. 20, 2023).

customer.  In doing so they are unlike seamen or railroad employees who regularly and directly engage in interstate commerce.  Also, a delivery provider's vehicle is not "vital to the commercial enterprise of the employer" (Point Pickup), *Bissonnette*, 49 F.4th at 662 (2d Cir. 2022), particularly when they do not need access to a vehicle in order to be hired. Thus, a vehicle *is not* a necessary component of the work.  Viewing these factors in addition to those already assessed earlier in this ruling renders clear that workers in Plaintiffs' class are not engaged in foreign or interstate commerce.

### C.  Whether the Class and Collective Action Waivers are Enforceable

The final issue remaining is whether Defendants may compel Plaintiffs to arbitrate their claims on an individual basis by enforcing the class action waiver portion of the MDRA:

> **Waiver of Class, Collective, Multi-Plaintiff, and Representative Actions ("Waiver")**:  Covered claims must be brought on an individual basis only, and arbitration on an individual basis is the exclusive remedy. No arbitrator has authority to consolidate claims or proceed with arbitration on multi-plaintiff, class, collective, or representative basis. Should such a claim be initiated in arbitration, the arbitrator shall summarily reject it as beyond the scope of this Agreement. Any disputes concerning the applicability or validity of this Waiver shall be decided by a court of competent jurisdiction, not by the arbitrator. In the event a court of competent jurisdiction determines that this Waiver is unenforceable with respect to any claim, this Waiver shall not apply to that claim, and that claim only must be initiated in court (subject to applicable claims and defenses) as the exclusive forum.

MDRA at § 5, ECF No. 38-3.  While Plaintiffs argue that the waiver is unenforceable under Massachusetts law, their argument is limited to the applicability of the Massachusetts Arbitration Act in the event the FAA does not apply.  Pl.'s Opp. at 17–22, ECF No. 42.  As discussed, the FAA does apply.  Plaintiffs do not argue that the class

action waiver is unenforceable despite applicability of the FAA.  Accordingly, the court finds that Plaintiffs have conceded to the validity of the class action waiver where the FAA applies.  *See Davarci v. Uber Techs., Inc.*, No. 20-CV-9224 (VEC), 2021 WL 3721374, at *5 n.11 (S.D.N.Y. Aug. 20, 2021), *motion to certify appeal denied*, No. 20-CV-9224 (VEC), 2021 WL 5326412 (S.D.N.Y. Nov. 15, 2021) (deeming plaintiffs to have conceded to the class-action waiver in arbitration agreement after failing to respond to defendant's argument that the waiver is valid and enforceable).  Even if the court were to construe Plaintiff's argument that the class action waiver is unenforceable under Massachusetts law, the Supreme Court has recognized that the FAA preempts state law barring enforcement of a class-arbitration waiver.  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 351 (2011).

## IV.    CONCLUSION

Plaintiffs have agreed to arbitrate their claims against Defendant by executing MDRA.  The FAA, which is applicable to the MDRA, requires the court to "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."  9 U.S.C. § 3.  Accordingly, Defendant's motion to compel arbitration on an individual basis and stay the action hereby is **GRANTED** (ECF No. 36).  In light of this order, Plaintiff's motion to certify the class hereby is **DENIED** as moot (ECF No. 43).  This action hereby is stayed pending arbitration.

**IT IS SO ORDERED.**  Entered at Hartford, Connecticut, this 20th day of April, 2023.

*/s/*
OMAR A. WILLIAMS
United States District Judge